**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**DETTRA E. FLORENT**                                           **CIVIL ACTION**

**VERSUS**                                                             **NO: 09-5512 "F"(1)**

**MICHAEL ASTRUE, COMMISSIONER**
**OF SOCIAL SECURITY, WASHINGTON,**
**D.C.**

## REPORT AND RECOMMENDATION

The plaintiff, Dettra E. Florent, seeks judicial review of the final decision of the
Commissioner of the Social Security Administration (the "Commissioner") denying her claim for
Disabled Widow's Benefits ("DWB") under Title II of the Social Security Act (the "Act"), 42
U.S.C. § 402(e), and her claim for Supplemental Security Income ("SSI") under Title XVI of the
Act, 42 U.S.C. § 1382(a).

## PROCEDURAL HISTORY

On April 19, 2005, Florent submitted applications for DWB and SSI benefits.  R. 52-53 and
271-73.  She reported that she became disabled on June 4, 2002.  R. 53 and 271.  On July 12, 2005,
the Commissioner denied her claims.  R. 32-35.  On November 19, 2007, there was a hearing before
an Administrative Law Judge ("ALJ"), with Florent being represented by counsel.  R. 286-307.  On
February 14, 2008, the ALJ issued an unfavorable decision.  R. 16-29.  On July 8, 2009, the Appeals

Council denied her request for review.  R. 4-6.

On August 14, 2009, Abed filed a complaint with this Court.  Rec. Doc. 2. The parties submitted cross-motions for summary judgment. Rec. Docs. 11 and 14.  Florent is represented by counsel in this proceeding.

## STATEMENT OF ISSUES ON APPEAL

1.     Is ALJ's decision that Florent is not disabled supported by substantial evidence?

2.     Did the ALJ err in his application of the GRID rules?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.     Florent is the unmarried widow of the deceased insured worker and has attained the age of 50.  She meets the non-disability requirements for DWB set forth in section 202(c) of the Social Security Act.[1]

2.     The prescribed period for DWB ended on August 31, 2005.

3.     There is no evidence demonstrating that Florent engaged in substantial gainful activity since June 4, 2002, the alleged onset date.

4.     Florent has the following severe impairments:  cervical spondylosis C5-C7; C-7 radiculopathy; mild restrictive airways defect; and hypertension.

5.     Florent does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

6.     Florent has the residual functional capacity to perform a limited range of light work.

---

[1] Because the ALJ expressly found that Florent met the non-disability requirements for DWB and denied her applications based solely on a finding that she was not disabled, only the disability requirements are at issue in this appeal.

7.      Florent cannot return to past relevant work.

8.      On the alleged disability onset date, Florent was a younger individual age 18-49, having been born on August 25, 1953.  At the time of the hearing, she was fifty-four years old which was within the category of closely approaching advanced age.

9.      Florent has at least a high school education and is able to communicate in English.

10.     Transferability of job skills is not an issue because Florent does not have past relevant work.

11.     Considering Florent's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

12.     Florent had not been under a disability, as defined in the Social Security Act, from June 4, 2002, through the date of the decision.

R. 21-28.

## ANALYSIS

a.      **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131,

135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo,* or substitute its judgment for the Commissioner's. <u>Perez</u>, 415 F.3d at 461; <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1022 (5th Cir. 1990); <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. <u>Id</u>. §§ 404.1520, 416.920; <u>Perez</u>, 415 F.3d at 461; <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).[2] The

---

[2] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the

five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors:  (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

---

claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

     Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

     Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

     Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

b.  **Testimony at the Hearing**.

Florent was born on August 23, 1953.  R. 289.  She went to the twelfth grade in school.  R. 289.  She is able to read, write, do arithmetic, and has a driver's license.  R. 289-90.  She worked as an assistant custodian for the school board for twenty-two years.  R. 290-91.  Her duties included opening and closing the building, assisting the staff and children, and sweeping the floors.  R. 291 and 301.

On June 4, 2002, she "pulled [her] neck" while opening a gate while on duty and was sent to the doctor.  R. 291.[3]  After taking x-rays, the doctor said Florent could return to work; however, when she returned to work, she was sent home and given Worker's Compensation benefits.  R. 291-92.  She continued to receive such benefits until 2005, and she then received a $10,000 settlement.  R. 292.  She remained under the care of Dr. Giles.  R. 292.

When asked how she spent her time, she replied that she "just sit[s] around and look[s] at TV."  R. 292 and 298.  She is unable to do her chores, such as washing dishes, because her back "give[s] out" and she has to sit down.  R. 299.  She is able to bathe herself, but she unable to wash her hair because she cannot lift her harms over her head.  R. 299.

Florent complained of numerous ailments as follows.

She said her hands are "bad."  R. 292.  She has a history of carpal tunnel syndrome; her hands ache, swell, and shake; and she has no strength in her hands.  R. 293.   She is right-handed, and that hand bothers her the most.  R. 294.  She sometimes soaks her hand in hot water to soothe the pain.  R. 296.

---

[3] At the hearing, Florent testified that the accident occurred on June 4, 2001; however, that was a misstatement, in that the records reflect that it actually occurred on June 4, 2002.

She also complained of leg pain. She said she experienced pain in the "muscle joint" and from her thigh all the way to her feet which become numb. R. 294. She has blood clots in her legs, and she uses a walking stick at times. R. 294. She cannot walk a block because her legs "give out." R. 292. She sometimes finds relief by lying in a tub of hot water. R. 296.

She also stated that her back "worr[ies her]." R. 292. She said that her backbone is "crooked." R. 294-95. Again, she sometimes finds relief by lying in a tub of hot water. R. 296.

She also experiences pain in her hip bone and numbness in her neck and shoulder. R. 296.

She also stated that she suffers from high blood pressure and takes four medications for the condition. R. 298.

She said that the pain she experiences causes her to cry. R. 295. When she calls the doctor, he tells her to go to the emergency room; however, when she goes "they give me the same stuff I have already." R. 295-96. She stated that she "needs to have all this fixed," but she is unable to do so because she is not covered by Medicare or Medicaid. R. 296-97. She said that she was once scheduled for neck surgery, but it could not be performed because a torn tissue was found in her neck. R. 297.

A vocational expert, Cindy Harris also testified at the hearing. She stated that Florent could perform her past work but not as it was normally found. If her past work was unavailable, she could perform other jobs. For example, Florent could perform "light, unskilled hand packager positions" (of which there are 1,000 such positions in the state and 100,000 nationally), "light, unskilled assembly positions" (of which there are 2,000 such positions in the state and 200,000 nationally), or "light, unskilled cashier positions" (of which there are 3,000 such positions in the state and 300,000 nationally). R. 303.

c.    **Medical Evidence**.

On the date of her injury, June 4, 2002, Florent had x-rays of her cervical spine.  The x-rays reflected that there was a "straightening of the usual cervical curvature ... with moderate anterior hypertrophic spurring at the levels of C5 through C7."  The diagnostic impression was "degenerative spondylosis, C5 through C7."  R. 238.

Florent started physical therapy for her injury on June 5, 2002.  Therapy was discontinued on August 12, 2002, after she "report[ed] resolution of symptoms and restoration of pre-injury status" and the therapy goals were met.  R. 203-37.

On June 10, 2002, Florent was examined by Dr. M. Coyen.  At the time of that visit, Florent had completed one treatment of physical therapy and been prescribed Flexeril and Naprosyn. She complained of weakness, vomiting, and dizziness, and she noted that she still had pain in her neck and shoulder.  Dr. Coyen indicated that she should continue with the physical therapy.  R. 122.

On June 19, 2002, Florent had a follow-up visit with Dr. Jamesetta W. Tate.  Florent was "complaining of pain in trapezius muscle area and intermittent stiffness of her neck."  Dr. Tate noted: "Moderate tenderness of the left lower neck.  There is limited passive range of motion with pain on rotation right, flexion and rotation left.  Pain is along left trapezius muscle.  There is no pain involving left shoulder joint.  Bilateral shoulder range of motion moral.  Strength normal."  Physical therapy was to continue daily for four days, and Dr. Tate prescribed Celebrex and Cyclobenzaprine. R. 234.

On July 10, 2002, Florent was examined by Dr. Gordon P. Nutik.  He noted the difficulty posed during the examination by Florent's uncooperativeness:  "She refused to walk on her heels and toes saying that she walked flat foot.  This patient had a tendency to do what she wanted to do

and she would refuse to look left, but she was moving her head and neck to the left on her own several times during this examination." He further noted that Florent "may have sustained a mild soft tissue strain about the neck and left shoulder. Examination at this time revealed what appeared to be voluntary restriction of neck, as well as shoulder motion." He concluded: "I would recommend an active program of physical therapy for range of motion and stretches about the neck and left shoulder. I would anticipate that she should improve as she had a better range of motion than she was willing to show consistently during this exam ...." He prescribed no additional medications and noted that she could perform sedentary work. R. 250-52.

On July 19, 2002, Florent underwent an MRI of her cervical spine. The results indicated: "Moderate spondylosis is noted in the lower mid cervical region ... and small to moderate sized central disc extrusions are noted in the C4-C5, C5-C6 and to a lesser extent the C6-C7 levels ...." R. 249.

Florent was again seen by Dr. Nutik on July 24, 2002. He had reviewed the MRI results but noted that Florent was "difficult to assess because she has such variable range of motion and it is difficult to get any objective clinical findings .... She also exhibits inconsistencies and variability concerning the range of left shoulder motion." He recommended "supportive treatment for range of motion and stretches about the neck and left shoulder." He also suggested that she get a second opinion from a neurosurgeon. Lastly, he noted "new symptoms in the thoracolumbar spine," which were symptoms not present during the previous examination. R. 246-48.

Dr. Nutik reexamined Florent on August 14, 2002. He noted that she had completed her course of physical therapy and that the therapist indicated that the goals were met. He further noted: "Ms. Florent appears to have reduction in the range of neck motion, which is much less than when

I saw her on July 24th. She does not exhibit any neurological changes." He again noted that Florent should get a second opinion from Dr. Robert L. Applebaum. Dr. Nutik discontinued therapy, told Florent to continue with a home exercise program, and prescribed no medications. He was still of the opinion that Florent could do "sedentary work." R. 244-45.

On September 11, 2002, Florent was examined by Dr. Applebaum. That examination revealed "minimal mechanical and neurological findings." He reviewed the July 19 MRI results and noted that they showed "moderately severe cervical spondylosis present, particularly at the C4-5 and C5-6 levels with some compression of the thecal sac and possibly the spinal cord. There are some questionable lesions present within the cord." He scheduled another MRI. R. 262-64.

Florent was then again reexamined by Dr. Nutik on September 18, 2002. He noted: "Ms. Florent has continuing complaints about the neck and now she has left shoulder complaints and complaints of numbness about the left hand. I have concerns about the clinical findings, in that she does have some inconsistencies seen concerning the range of neck motion." R. 242-43.

The new MRI was performed on September 20, 2002. The resulting impressions were: "1. Small central type 2B disc extrusion or herniations at the C4-C5 and C6-C7 levels. 2. A moderate sized central broad based type 2B disc extrusion noted at C5-C6 level resulting in moderate spinal stenosis and cord compression." R. 260-61.

Florent was reexamined by Dr. Applebaum on October 2, 2002. He noted that "examination of the neck revealed moderate limitation of motion and rigidity present in the cervical spine." He also noted that "[m]otor examination showed no evidence of atrophy, weakness, or fasciculations" and that the "repeat MRI of the cervical spine was reviewed and shows evidence of moderate spurring present at the C5-6 and C6-7 levels with slight compression of the spinal cord." Dr.

Applebaum also noted Florent refused additional testing to determine whether she would be a candidate for surgical intervention, desiring instead to continue on conservative treatment. R. 258-59.

Florent again saw Dr. Nutik on October 21, 2002. He noted that "she continues with complaints about the neck, as well as radiation into the left upper extremity." However, he concluded: "At this time, I do not have very much else to offer her from my standpoint and recommended that she continue under Dr. Applebaum for further evaluation and treatment of the neck. She was discharged from my care. She is to be off of work." R. 240-41.

Florent then saw Dr. Applebaum on November 6, 2002. He noted: "[T]he patient is improving and does not desire further neurosurgical evaluation. She was advised that she could return to moderate work which should consist of no prolonged bending or stooping or lifting of any loads greater than 30 pounds." R. 256-57.

Florent was reexamined by Dr. Applebaum on December 30, 2002. He noted that the examination revealed minimal rigidity present in the neck and a normal range of motion was present. He concluded: "[T]he patient is improved. She does not desire neurological intervention. There is no need for further neurosurgical, diagnostic or therapeutic procedures. I still feel she can continue to work as noted in my report of November 6, 2002." R. 254-55.

On July 10, 2003, Florent went for another MRI on her left shoulder. The resulting impressions were: "Essentially negative MRI scan of the left shoulder. There is very little free fluid in the shoulder joint. The rotator cuff and the biceps tendon are unremarkable." R. 107.

On July 16, 2003, Florent was seen by Dr. Alain F. Cracco. He noted her "significant progress," placed her on Vioxx, and instructed her to continue her pendulum exercises. He noted

that she "cannot work at this time." R. 106 and 268. Still complaining of pain, Florent was again seen by Dr. Cracco on July 30, 2003. The diagnosis was cervical spondylosis and pericapsulitis, and he recommended physical therapy and exercise. R. 105 and 267.

On August 27, 2003, Dr. Salvador Murra of the Louisiana Headache & Neurological Clinic prepared an EMG Report indicating that Florent was complaining of "neck pains radiating along the left arm." Dr. Murra's impressions were: "1) Chronic Cervical Radiculopathy affecting predominantly the C7 root bilaterally; left more than right. 2) Probably Bilateral Carpal Tunnel Syndrome (mild). This might be an incidental finding. Clinical correlation is necessary." R. 95.

On September 5, 2003, Florent returned to Dr. Cracco. He determined that her condition was resolving and that she could return to light duty work. R. 104. He was of the same opinion after a subsequent visit on November 5, 2003. R. 103. He then examined her on four additional occasions. R. 99-102. On the final visit on July 21, 2004, he again determined that Florent could return to work. R. 99.

On October 11, 2004, Florent sought the services of Dr. Emile Labranche for various complaints including numbness in her lips, insomnia, swollen feet, and a poor appetite. He adjusted her medication and suggested a consultation with a cardiologist. R. 111.

On October 18, 2004, the Chapital Cardiology Clinic performed a Gated Cardiolite SPECT examination. The resulting impressions were: "1. Stress test electrocardiographically nondiagnostic for ischemia. 2. Decreased aerobic capacity. 3. Hypertensive response to exercise. 4. Test was terminated due to patient complaints of shortness of breath and fatigue. There were no arrhythmias observed during the examination. The patient denied any chest pain." R. 147. On that same date, a 2-D M-Mode Echocardiogram/Doppler Report was also performed. The resulting

impressions were: "1. Concentric left ventricular hypertrophy with overall good left ventricular contractility with ejection fraction estimated at 75%. 2. Sclerotic aortic root and valve without any evidence of hemodynamically significant aortic stenosis. 3. No evidence of a left ventricular thrombus or hemodynamically significant pericardial effusion appreciated on this study. 4. Cardiac Doppler studies reveal evidence of diastolic dysfunction and mild mitral regurgitation." R. 148-49.

On November 10, 2004, Florent returned to the Chapital Cardiology Clinic complaining of chest pain, hypertension, and asthma. Her medications were again adjusted. R. 139-40.

On March 10, 2005, the Chapital Cardiology Clinic performed a carotid Doppler study. The resulting impressions were: "1. Mild diffuse atherosclerotic changes bilaterally. 2. No evidence of a hemodynamically significant stenosis in either carotid artery system." R. 135-36. On that same date, an arterial Doppler of the lower extremities was also performed. The resulting impressions were: "1. Abnormal ankle/brachial indicies suggesting mild disease bilaterally. 2. Mild to moderate diffuse atherosclerotic changes bilaterally. 3. A > 50% stenosis of the left distal superficial femoral artery. 4. No evidence of a hemodynamically significant stenosis in the right lower extremity." R. 137-38.

During a routine medical appointment on March 21, 2005, a blood clot was found in her left leg. Diovan was prescribed and arrangements were made for an evaluation at Ochsner. R. 110.

On April 4, 2005, the Ochsner Heart and Vascular Institute performed a CT angiogram of Florent's lower extremities. The resulting impressions were: "Mild atherosclerotic plaque with minimal luminal obstructive atherosclerosis. No clear vascular etiology visualized for lower extremity pain." R. 125.

On June 7, 2005, Dr. Gary F. Carroll performed spirometric testing. His impressions were

13

that the findings "represent[ed] a mild restrictive defect. There is evidence of early small airway closure, not improved by bronchodilator therapy." R. 151-52. X-rays were also taken. The x-rays showed "no evidence of active pulmonary or cardiac pathology" in the chest and "no evidence of peritendinous calcification and no evidence of fracture, dislocation or other disease" in the left shoulder. R. 167. Concerning the cervical spine, it was noted that "[e]xamination reveals loss of a normal cervical lordosis and narrowing of the sixth cervical interspace with hypertrophic reaction compatible with degenerative disc pathology, and narrow fourth cervical interspace without hypertrophic reaction suggesting that this represents a diminutive disc space rather than disc pathology. Retrotracheal and retropharyngeal soft tissues do not appear unusual. There is no evidence of acute fracture, dislocation or other disease." R. 167.

Also on June 7, 2005, Dr. Miljana Mandich evaluated Florent. Dr. Mandich's findings were as follows:

> This 51-year-old black female says that she worked as a laborer until 2002 when she injured her neck and left shoulder opening and closing a heavy iron gate at work. She has not worked since then. She says she was seeing Dr. Craco and had x-rays and an MRI of her left shoulder. Dr. Craco suggested surgery which was not done for an unknown reason. The patient says that she still gets pains along the right side of the neck and still has pains and stiffness in the left shoulder. She has smoked about 1/3 of a pack of cigarettes per day for about 30 years. She says she started getting "asthma and bronchitis" from time to time around the age of 43. She has been on high blood pressure medication since last year when she says she saw Dr. Emmet Chapital because of shortness of breath and chest pains. She was not hospitalized but says she had some heart tests including one with dye put into the vein in her arm. Afterwards she was told that she had a "leaking valve." I have no access to any of her medical records and all of the information was provided by the patient. She says she gets short of breath with walking about two blocks. Two or three times a month she gets sharp pains in the middle of the chest that she relieves by taking an Aspirin and relaxing for 1-1/2 hours as advised by Dr. Chapital.
> On physical examination, the patient is heavyset and ambulates without difficulty. Her blood pressure is 180/100 at this time. The rest of the cardiovascular examination is normal. Chest and lungs are normal with normal respiratory

expansion and normal breath sounds bilaterally. She ambulates without self-support and has normal range of motion of the neck and lower back after some initial guarding and resistance to the range of motion movements of the neck. She can walk on heels and toes and can squat and rise without support. Extremities are normal with normal appearance and range of motion of all joints except the full forward elevation of the left shoulder was achieved only after some initial resistance and guarding. The patient did not allow full abduction of the left shoulder and she actively resisted the abduction allowing lifting the arm to about 130 degrees. Neurological examination is normal with no muscle atrophy and normal symmetrical muscle tone and bulk in upper and lower extremities. She has normal grip strength bilaterally. She is status post bilateral carpal tunnel release, one in 2000 and one in 2001 and asymptomatic at this time. The rest of the physical examination is unremarkable.

R. 162-63.

On April 17, 2006, Florent was seen in the emergency department of the Medical Center of Louisiana at New Orleans ("MCLNO") complaining of pain "all over," especially in her hands and legs. She was diagnosed with carpal tunnel syndrome and referred to the neurology department. R. 195.

On September 21, 2006, chest x-rays were taken at MCLNO. The x-rays showed "no acute airspace disease, heart size normal." R. 186.

On November 16, 2006, Dr. David Gloss of MCLNO wrote on a prescription pad: "Ms. Florent is disabled from cervical myelopathy. Please evaluate for benefits." R. 178.

On July 5, 2007, Florent was seen at MCLNO complaining of pain. Neurontin was prescribed and a renal ultrasound was ordered. R. 179. She was again seen at MCLNO on July 25, 2007, and the records indicate that she was scheduled for cervical surgery on August 2, 2007. R. 269-70.[4] Another MRI of the left shoulder was performed at MCLNO on September 7, 2007. The

---

[4] The records do not indicate that the surgery was performed. The ALJ was wrong, however, when he stated that the medical records did not indicate surgery had been scheduled. R. 26.

resulting impressions were:  "It is difficult to totally exclude partial undersurface tear of the rotator cuff although I doubt it.  There is no through and through tear.  There is no fracture or dislocation. No lytic or blastic change.  Bicipital tendon unremarkable.  Genoid grossly normal."  R. 185.  The renal ultrasound was then performed on September 11, 2007, and the results were normal.  R. 184.

d.    **Plaintiff's Appeal.**

Issue 1.         Is the ALJ's decision that Florent is not disabled supported by substantial evidence?

In support of her motion for summary judgment, Florent advances several arguments with respect to her contention that the ALJ's decision is not supported by substantial evidence.  For the following reasons, those arguments are unpersuasive.

First, Florent argues that the ALJ accorded too much weight to Dr. Applebaum's assessments while "seemingly disregard[ing] almost all of the other medical evidence."  That argument has no merit.  The ALJ's decision reflects that he did not disregard the existing medical evidence; on the contrary, he carefully reviewed Florent's numerous medical records.  He noted that some of those records in fact documented various medical problems, including:  (1) Dr. Cracco's finding of degenerative spondylosis C5-C7, R. 23; (2) the test results indicating evidence of mild arterial disease, R. 24; (3) the test results indicating a mild restrictive defect with evidence of small airway closure, R. 24; and (4) Dr. Mandich's findings consistent with degenerative fifth and sixth cervical discs and narrowing of the fourth cervical interspace, R. 25.  However, the ALJ also noted the abundance of evidence inconsistent with Florent's alleged symptoms and purported disability, including:  (1) the negative left shoulder MRI of July 10, 2003, R. 23; (2) Dr. Nutik's observation that she appeared to be voluntarily restricting her movement, R. 23; (3) Dr. Nutik's ultimate conclusion that she was capable of sedentary work, R. 23; (4) the successful achievement of the

physical therapy goals and return of strength and range of motion to normal limits, R. 23; (5) Dr. Applebaum's assessment that she was capable of "moderate work" and that there was no need for further neurosurgical, diagnostic, or therapeutic procedures, R. 24; (6) the largely negative echocardiogram, R. 24; (7) the MCLNO chest x-rays indicating no acute airspace disease and a normal heart size, R. 24; (8) Dr. Mandich's findings of normal muscle bulk and strength, R. 25; (9) Dr. Mandich's determination that the cardiovascular examination was normal, R. 25; and (10) the negative left shoulder MRI of September 7, 2007, R. 25. Accordingly, Florent's contention that the ALJ accorded undue weight to Dr. Applebaum's assessments and disregarded the other evidence simply is not supported by the record.

Second, Florent argues that the ALJ summarily rejected Dr. Nutik's opinion that she was capable of only sedentary work and Dr. Gloss's opinion that she was disabled due to cervical myelopathy. Regarding Dr. Nutik, it is apparent his conclusions were accorded due consideration in light of the fact that he found Florent was purposely thwarting an adequate examination by refusing to fully cooperate. The ALJ correctly observed that "Dr. Nutik noted that claimant self-limited during his examinations and 'had a tendency to do what she wanted to do.'" R. 27. As for Dr. Gloss's one-sentence scribble on a prescription pad, the ALJ correctly noted the "opinion" expressed was wholly conclusory and unsupported by medical records. Accordingly, it was properly accorded little weight. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003) ("Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'"); 20 C.F.R. §§ 404.1527(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. ... A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will

determine that you are disabled.") and 416.927(e)(1) (same).

Third, Florent contends that the ALJ failed to fully consider the combined effect of all of Florent's impairments. The flaw in this contention is that it presupposes that Florent's allegations concerning her multitude of symptoms were credible. They were not. On the contrary, as is evident from the medical records, the medical tests failed to produce objective evidence that many of the impairments were severe enough to cause the symptoms Florent alleged or, in some instances, existed at all. Based on the medical findings that Florent intentionally self-limited the examinations and the lack of documented support for some of her self-reported symptoms, it is apparent that the ALJ concluded that Florent was not entirely candid or credible. Based on the record, this Court cannot find that conclusion unwarranted.

The bottom line is that the ALJ concluded that Florent suffered from only some impairments she alleged, specifically cervical spondylosis, mild restrictive airways defect, and hypertension. He also concluded that those impairments, even considered in combination, simply were not sufficiently severe to render her disabled. Those findings are clearly supported by substantial evidence.

<u>Issue 2.</u>        Did the ALJ err in his application of the GRID rules?

Florent's second claim is that the ALJ erred in applying the GRID rules. In support of that claim, she makes several contentions.

First, Florent contends that the ALJ should have applied the GRID applicable to persons of advanced age because she is currently fifty-five or older. It is true that persons fifty-five or older are considered to be of advanced age. 20 C.F.R. §§ 404.1563(e) and 416.963(e). However, Florent's current age is of no moment for the following reasons.

As to Florent's application for DWB, because she is less than sixty years of age, she must

establish that she was disabled not later than seven years after her husband's death. 20 C.F.R. § 404.335(c). Because her husband died on August 27, 1998, Florent is eligible for DWB only if she met the disability requirements not later than August 31, 2005. On that date, she was fifty-two years old. Therefore, for DWB, the GRID for persons "closely approaching advanced age" applied. See 20 C.F.R. §§ 404.1563(d) and 416.963(d).

The same is true for Florent's application for SSI. For those benefits, the ALJ could only consider Florent's age up to the time of his decision. Crady v. Secretary of Health and Human Services, 835 F.2d 617, 620 (6th Cir. 1987) ("The relevant time for determining whether the claimant is disabled thus appears to be the date of the ALJ's decision. The decision date is the relevant cut-off point for analysis of all factors on which the determination of disability *vel non* is based, including the claimant's age."); Russell v. Commissioner of Social Security, 20 F.Supp.2d 1133, 1134 (W.D. Mich. 1998) ("For purposes of determining age under the grids, the claimant's age as of the time of the decision governs." (quotation marks omitted)). At the time of the ALJ's decision, Florent was fifty-four years, five months, and twenty days old. Accordingly, under the regulations, she did not fall within the "advanced age" category as she argues but instead still fell within the "closely approaching advanced age" category.[5]

The Court notes that, although Florent fell within the "closely approaching advanced age"

---

[5] The Court is, of course, aware that the regulations specifically provide that the age categories are not to be applied "mechanically *in a borderline situation*." 20 C.F.R. §§ 404.1563(b) and 416.963(b) (emphasis added). While the regulations do not define the term "borderline situation," "[g]enerally, courts hold that a person within six months of the next higher age category is considered 'borderline.'" Lewis v. Commission of Social Security, 666 F.Supp.2d 730, 738 (E.D. Mich. 2009); see also Russell, 20 F.Supp.2d at 1135 (noting that the Appeals Council appears to employ a six-month window). Florent was not within six months of the advancing age category. Moreover, although she was *close* to being within six months and therefor *close* to borderline, that is not the test. "Close to borderline" is not "borderline," and to hold otherwise would effectively render the categories so amorphous as to make their application a matter of whim.

category, it appears that the ALJ applied the GRID for a "younger person" (i.e. a person under 50). However, under either of those age categories, Florent would be considered not disabled. See GRID Rules 202.13 and 202.20. Accordingly, even if the ALJ erred in this respect, it was harmless error and, therefore, does not warrant reversal. See Hammond v. Barnhart, 124 Fed. App'x 847, 851 n.8 (5th Cir. 2005) ("The harmless error doctrine applies in Social Security disability cases."); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Second, Florent contends that the ALJ should have applied the GRID applicable to persons who did not graduate from high school because Florent completed only the eleventh grade. However, Florent's disability report indicated that she completed twelfth grade. R. 66. Moreover, at the hearing, Florent was asked: "And you finished high school, is that right?" Florent, while represented by counsel, replied: "I went to 12th grade." R. 289. Counsel sought no clarification of that answer. The ALJ was therefore entitled to rely upon that unchallenged information, and, further, Florent has never presented any evidence to the contrary. In any event, under the applicable GRID for persons capable of limited to light work, an applicant such as Florent who is closely approaching advance age is considered not disabled regardless of whether she graduated high school (GRID Rule 202.13) or failed to graduate but is literate and able to communicate in English (GRID Rule 202.10). Therefore, this purported factual dispute is of no consequence.

Third, Florent contends that the ALJ should have applied the GRID applicable to persons who are capable of only sedentary work. However, as previously noted, the ALJ found that Florent was capable of light work and substantial evidence exists to support that determination. Therefore,

20

the ALJ appropriately applied the GRID applicable to persons capable of light work and, therefore, this contention fails.

Lastly, as noted in defendant's cross-motion for summary judgment, because the ALJ noted that additional limitations eroded Florent's ability to perform a full range of light work, he properly obtained and relied on the testimony of a vocational expert. See Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2). Thus, substantial evidence in the form of vocational expert testimony supports the ALJ's finding of no disability at step five of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c), 416.960(c); Masterson v. Barnhart, 309 F.3d 267, 273 (5th Cir. 2002). Moreover, because Florent failed to offer evidence that she was incapable of performing the jobs the ALJ determined were available based on the vocational expert's testimony, she failed to meet her burden of establishing disability. See Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995); see also Masterson, 309 F.3d at 273.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that defendant's cross-motion for summary judgment (Rec. Doc. 14) be **GRANTED** and plaintiff's motion for summary judgment (Rec. Doc. 11) be **DENIED**.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[6]

New Orleans, Louisiana, this seventeenth day of June, 2010.

**SALLY SHUSHAN**
**United States Magistrate Judge**

---

[6] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.